**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| ROBERT ALLEN BROWN III, | CASE NO. 1:25-cv-01330 |
| Plaintiff, | JUDGE CHARLES ESQUE FLEMING |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Robert Allen Brown III ("Plaintiff" or "Mr. Brown") seeks judicial review of the final decision of Defendant Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1; ECF Doc. 7.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's final decision.

## I. Procedural History

Plaintiff filed his DIB application on December 30, 2022, alleging an onset date of December 1, 2022. (Tr. 17, 202-08.) He alleged disability due to cervical bulging discs, lumbar bulging discs, arthritis, migraines, bilateral shoulder pain, depression, and anxiety. (Tr. 103, 113, 239.) Mr. Brown's application was denied initially and upon reconsideration (Tr. 99-108, 110-17), and he requested a hearing (Tr. 118-19). After conducting a hearing on Mr. Brown's claims (Tr. 39-69), an Administrative Law Judge ("ALJ") issued a decision denying his application on

July 12, 2024 (Tr. 14-38).  On April 28, 2025, the Appeals Council denied Mr. Brown's request to review the ALJ decision, making the July 12, 2024 decision the final decision of the Commissioner.  (Tr. 1-6.)

Mr. Brown filed his Complaint on June 26, 2025, challenging the Commissioner's final decision denying his application for disability benefits.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 7, 10 & 11.)  Mr. Brown raises two issues in this appeal:

(1) the ALJ erred when relying on an insufficient record and erred when failing to order a physical consultative examination; and

(2) the ALJ erred in his evaluation of Plaintiff's subjective allegations and erred when failing to identify substantial evidence supporting the RFC finding.

(ECF Doc. 7, pp. 1, 10-25; ECF Doc. 11.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mr. Brown was born in 1981, and he was 41 years old on the alleged disability onset date, making him a younger individual under Social Security Regulations.  (Tr. 32, 246.)  He has at least a high school education with training in auto mechanics.  (Tr. 32, 240.)  He received special education services while in school, and he received his GED in 2000.  (Tr. 240, 309-22.)  Mr. Brown previously worked as a mechanic and laborer.  (Tr. 32, 49-51, 241, 248-55.)  He stopped working at the end of 2022.  (Tr. 49, 239.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

On October 7, 2022, Mr. Brown established care with Tabbitha Danielle Branham, CNP, at OhioHealth Physician Group Primary Care.  (Tr. 332-43.)  He sought medication refills and complained that he suffered neck pain for years and numbness in his hands and arms for one

month, describing the numbness as pins and needles. (Tr. 332-33.) He also reported a history of anxiety. (*Id*.) He started 150 mg of Effexor-XR a year and a half earlier. (*Id*.) He felt the medication had worked well all day until about three months earlier, when he started to feel his anxiety returning around dinner time. (*Id*.) He was using "'RSO' oil" at night for sleep and getting at least four to five solid hours of sleep. (*Id*.) He was not interested in counseling or seeing a behaviorist. (*Id*.) He was prescribed an additional 75 mg of Effexor XR to be taken at night. (Tr. 334.) Physical and psychiatric examination findings were normal. (Tr. 336-37.) CNP Branham ordered a cervical spine CT. (Tr. 342.)

On November 4, 2022, Mr. Brown returned to CNP Branham for follow up regarding his anxiety and depression. (Tr. 344-47.) His symptoms were not worse, but they had not improved. (Tr. 344.) He had started a new job and was not remembering to take his medication as directed. (Tr. 345.) He wanted to give it another four to six weeks to see if the medication would help before getting a behavioral health referral. (*Id*.) His GAD-7 (Generalized Anxiety Disorder) score was an 11 and his previous score was a 13. (*Id*.) He was generally sleeping well. (*Id*.) His physical and mental status examinations were normal. (Tr. 347.)

A December 16, 2022 CT scan of the cervical spine showed: degenerative changes at the C1-2 articulation; mild disc space narrowing with osteophyte formation and facet hypertrophy at C6-7; disc space narrowing at C7-T1; and reversal of the cervical lordotic curve which could indicate cervical muscular spasm. (Tr. 437-38.)

A February 2, 2023 cervical spine x-ray \ showed mild posterior disc space narrowing at C6-7 and C7-T1 with mild bilateral neural foraminal narrowing and no signs of instability. (Tr. 361.) A February 2, 2023 x-ray of the lumbar spine revealed mild disc space narrowing at L1-2 and L5-S1 with mild facet arthropathy at L5-S1 and no signs of instability. (Tr. 362.)

On February 3, 2023, Mr. Brown presented to Joel D. Siegal, M.D., at Key Clinics Neurosurgery and Spine Specialists for a consult regarding neck and low back pain.  (Tr. 352-56.)  He reported a history of severe neck and lower back pain for several years.  (Tr. 352, 356.)  He also reported severe headaches, weakness in the proximal arms, and numbness and tingling in the hands.  (Tr. 352.)  His symptoms were worse with sitting, walking, squatting, lifting, coughing and sneezing, weather, and range of motion and were alleviated with heat/ice, medication, lying down, and changing positions.  (Tr. 356.)  His examination showed: the ability to move from a sitting to a standing position without difficulty; an okay gait with good heel and toe walking; 5/5 bilateral upper extremity strength except for 4/5 strength in the left deltoid, biceps, and grip; decreased sensation to light touch in the left thumb and index finger; 5/5 bilateral lower extremity strength except for 4/5 hip flexion strength; okay sensation to light touch in lumbar area; and no significant pain with palpation during lumbar examination.  (Tr. 352, 353.)  Dr. Siegal thought it was possible that Mr. Brown had C5 and C6 radiculopathy; and because of the weakness in Mr. Brown's left arm biceps, deltoid, and grip, he recommended an MRI of the cervical spine to rule out C4 and C5 disc herniations.  (Tr. 352.)  Dr. Siegal also recommended an MRI of the lumbar spine to rule out an L2 or L3 disc herniation, which he said could help explain Mr. Brown's proximal leg weakness and low back pain.  (Tr. 353.)

Mr. Brown's March 2, 2023 lumbar MRI showed: bulging disc and hypertrophic changes of the posterior elements that produced mild canal, moderate left, and mild right-sided foraminal stenosis at L3-4; bulging disc with left foraminal herniation, annular tear and facet hypertrophy at L4-5; and mild canal, moderate to severe left, and mild right-sided foraminal stenosis.  (Tr. 357-58.)  Mr. Brown's March 2, 2023 cervical MRI showed disc disease of the cervical spine and reversal of the cervical lordotic curve consistent with cervical muscular spasm.  (Tr. 359-60.)

4

Mr. Brown returned to Dr. Siegal on March 21, 2023, regarding his neck, back, and leg pain and to review the MRI results.  (Tr. 349-51.)  During his examination, Mr. Brown was able to move from a sitting to a standing position without difficulty.  (Tr. 349.)  His examination revealed right sacral sulcal pain with palpation but no left sacral sulcal pain with palpation.  (*Id*.)  Right sacroiliac joint pain could not be reproduced with hip distraction, right Faber, or right leg thrust.  (*Id*.)  Dr. Siegal noted that the lumbar MRI showed foraminal far lateral disc herniation on the left at L3 and L4; and the cervical MRI showed a right C6 foraminal disc herniation with moderate to severe neuroforaminal narrowing, reversal of the cervical lordosis, and no significant neural compression otherwise.  (*Id*.)  Dr. Siegal ordered: physical therapy and a caudal epidural nerve block for the lumbar spine; physical therapy for the cervical spine; and a shoulder x-ray for right shoulder pain.  (Tr. 350-51.)

On March 28 and 31, and April 4, 2023, Mr. Brown attended physical therapy appointments at Crane Physical Therapy.  (Tr. 369-75.)  He complained of chronic neck and lumbar pain.  (Tr. 369, 372, 374.)  When examined at his initial visit, Mr. Brown was observed to have moderate forward head and kyphotic sitting posture.  (Tr. 369.)  His cervical range of motion was decreased to 50% in cervical extension.  (*Id*.)  Cervical pain was noted on the right with end range rotation bilaterally and decreased joint accessory movement on the left mid-cervical spine.  (*Id*.)  There was no focal weakness or asymmetry in the upper or lower extremities.  (*Id*.)  "Lumbar extension [was] [within functional limits] with extension 50% pain limiting."  (*Id*.)  There was tenderness in the right cervical paraspinal muscles into the trapezius.  (Tr. 370.)  Mr. Brown's rehabilitation potential was noted to be "good," with a recommendation for one to two therapy sessions per week.  (*Id*.)  However, Mr. Brown was discharged from physical therapy on April 26, 2023, due to financial constraints.  (Tr. 376.)

5

On May 11, 2023, Mr. Brown returned to CNP Branham for medication refills and complaints of neck, back, right shoulder, and elbow pain.  (Tr. 416-26.)  He felt his anxiety, depression, and mood were stable and controlled.  (Tr. 416.)  He was sleeping okay and had started sleeping in his bed again, rather than on the floor.  (*Id*.)  He relayed that Dr. Siegal told him he was not sure that surgery would help alleviate his pain.  (*Id*.)  He declined a pain management referral and said that using RSO usually made his pain "somewhat manageable." (*Id*.)  Physical and mental status examination findings were normal.  (Tr. 419.)

On October 11, 2023, Mr. Brown presented to Robert Gewirtz, M.D., of OhioHealth Physician Group Neuroscience for "an opinion regarding his original BWC claim which . . . [went] back to 2020."  (Tr. 392-95.)  Mr. Brown had injured his back in 2020 while working; he had experienced excruciating pain that started in his back and radiated into his left leg, but declined a recommendation for surgery at that time.  (Tr. 392.)  He switched to a job that required less physical lifting and stress, but continued to have symptoms.  (*Id*.)  Dr. Gewirtz indicated that Mr. Brown had "ultimately retired completely from work," with "essentially complete resolution of his pain except for occasional neck or low back pain which [wa]s minor and sporadic."  (*Id*.)  Dr. Gewirtz reviewed MRI scans from November 2020 and March 2023. (Tr. 392, 393.)  Mr. Brown's mental status examination was normal.  (*Id*.)  He had normal muscle bulk and tone, 5/5 strength throughout, normal sensation and gait, and normal reflexes in his arms and legs.  (Tr. 392-93.)  Mr. Brown was diagnosed with intervertebral disc disorder with radiculopathy of the lumbar region, lumbar degenerative disc disease, and cervical spondylosis without myelopathy.  (Tr. 393.)  Dr. Gewirtz noted Mr. Brown had "mild residual symptoms," but was not working.  (*Id*.)  Dr. Gewirtz found that Mr. Brown's original disc herniation from 2020 had "essentially resolved but left him with some degenerative disc disease [and] some mild

6

foraminal stenosis at L4-5 which [Dr. Gewirtz] believed to be intermittently and mildly symptomatic." (*Id*.)  Dr. Gewirtz did not feel that Mr. Brown needed neck or back surgery.  (*Id*.)  He recommended core strengthening exercises, stretching, and use of NSAIDs as needed.  (*Id*.)

On November 14, 2023, Mr. Brown returned to CNP Branham for a six-month follow up.  (Tr. 401-14.)  He felt his mood was stable but did not think his medication had been working as well as it had in the past.  (Tr. 401.)  He still had neck pain.  (*Id*.)  He also reported numbness and tingling in his right hand that occurred after he started a tiller.  (*Id*.)  He said his symptoms were "improving some."  (*Id*.)  Mr. Brown reported being nervous and anxious with a dysphoric mood.  (Tr. 402.)  On depression screening, Mr. Brown reported it was very difficult for him to work, take care of things at home, or get along with other people.  (Tr. 406-07.)  Mental and physical examination findings were normal.  (Tr. 404.)  CNP Branham added Elavil to Mr. Brown's medication to help with his mood, sleep, and pain.  (Tr. 401, 414.)

### 2. Relevant Opinion Evidence

#### i. Consultative Examiner

On August 22, 2023, Mr. Brown presented to Sudhir Dubey, Psy.D., for a psychological consultative examination.  (Tr. 378-84.)  He drove himself to the examination.  (Tr. 378.)  He reported pain-related issues for the past three years and a history of depression, anxiety, anger issues, and comprehension problems since childhood.  (*Id*.)  He described his mood as "blah" since childhood.  (Tr. 379.)  He denied crying episodes and reported feeling okay about himself.  (*Id*.)  He had problems sleeping due to pain.  (*Id*.)  He attempted suicide in 2000.  (*Id*.)  He denied anhedonia and reported no current issues of lethality.  (*Id*.)  He received mental health medication, Effexor, through his primary care physician.  (*Id*.)  He reported he was able to take care of his daily activities, including shopping, caring for pets, taking medication, driving, and

7

doing paperwork, but said he needed some oversight with managing money and maintaining a schedule.  (Tr. 380.)  His activities included watching television, listening to music, being on his phone, spending time outside, and doing light gardening.  (*Id*.)

As far as past work experience, Mr. Brown reported the average length of his jobs was about eight or nine years.  (*Id*.)  While his most recent job change occurred for pain-related reasons, he said that he typically changed jobs because of an issue with a coworker.  (*Id*.)  But he also reported that his relationships with coworkers and supervisors were "generally good."  (*Id*.)

On mental status examination, Mr. Brown's appearance and behavior were unremarkable and/or appropriate.  (*Id*.)  He was calm and stable.  (*Id*.)  His speech was normal; his thought processes were logical; he was alert and responsive; no attention problems were observed; he did not need simple directions or questions repeated; his recall of recent events was unremarkable; and his level of cognitive functioning was estimated to be in the average range.  (Tr. 381.)

Dr. Dubey found Mr. Brown's overall prognosis was "guarded" based on various factors, including that his "[c]urrent mood related issues [were] feeling 'blah'" and he had "some issues of anxiety."  (*Id*.)  Dr. Dubey noted that Mr. Brown was receiving his mental health treatment through his primary care physician and reported his mental health medication was helpful.  (*Id*.)  He concluded: "Based on all the available information, it appears that the symptoms are likely to improve as he continues to comply with mental health care, physical health and situational stressors stabilize."  (*Id*.)  He observed that Mr. Brown reported being able to manage his own finances with some oversight and concluded that Mr. Brown could manage his own benefits, noting that his overall level of intellectual functioning was estimated to be in the average range, he was making basic decisions on his own, and did not show mental health or cognitive issues that could affect his ability to understand the consequences of his decisions.  (Tr. 382.)

Dr. Dubey diagnosed depressive disorder, NOS. (*Id*.) He found Mr. Brown had no limitations in: understanding, remembering and carrying out instructions; maintaining attention and concentration; maintaining persistence and pace to perform simple tasks and to perform multi-step tasks; and responding appropriately to supervision and to co-workers in a work setting. (Tr. 382-83.) In the area of responding appropriately to work pressures in a work setting, Dr. Dubey stated: "Overall, dealing with usual work pressure, in the past was not an issue. In the context of this evaluation, a somewhat stressful situation for most, which includes interacting with a new doctor, in a new office, he was generally calm and stable." (Tr. 384.) But Dr. Dubey also opined: "Based on all the available information, in dealing with work pressure, he would possibly have some difficulties. This is based on the issues that he reported. This may lead to some frustration for him, coworkers and supervisors." (*Id*.)

### ii. State Agency Consultants

On August 1, 2023, state agency medical consultant Shanker Gupta, M.D., completed a physical RFC assessment. (Tr. 77-79.) Dr. Gupta opined that Mr. Brown could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 6 hours in an 8-hour workday; sit for a total of 6 hours in an 8-hour workday; never climb ladders/ropes/scaffolds; occasionally stoop, crouch, and crawl; frequently climb ramps/stairs, balance, and kneel; occasionally reach overhead bilaterally; frequently handle and feel on the left; and should avoid concentrated exposure to unprotected heights and working on moving machinery. (*Id*.) Upon reconsideration, on December 10, 2023, state agency medical consultant Leon Hughes, M.D., affirmed Dr. Gupta's findings. (Tr. 88-89.)

On September 4, 2023, state agency psychological consultant Ermias Seleshi, M.D., completed a Psychiatric Review Technique ("PRT") (Tr. 75-76) and mental RFC (Tr. 79-80). In

the PRT, Dr. Seleshi opined that Mr. Brown had mild limitations in his ability to understand, remember, or apply information and interact with others and moderate limitations in his ability to concentrate, persist, or maintain pace and adapt or manage oneself.  (Tr. 76.)  In the RFC, Dr. Seleshi opined that he could: "perform routine tasks without expectation for sustained close concentration or fast paced performance" and "complet[e] routine tasks in a static environment with predictable expectations and infrequent changes explained in advance."  (Tr. 79-80.)

On December 8, 2023, state agency psychological consultant David Dietz, Ph.D., completed a PRT (Tr. 86-87) and mental RFC (Tr. 89-91) upon reconsideration.  In the PRT, Dr. Dietz opined that Mr. Brown had mild limitations in his ability to understand, remember, or apply information, and moderate limitations in his abilities to: interact with others, concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 86.)  Like Dr. Seleshi, Dr. Dietz opined that Mr. Brown could: "perform routine tasks without expectation for sustained close concentration or fast paced performance" and "complet[e] routine tasks in a static environment with predictable expectations and infrequent changes explained in advance."  (Tr. 90-91.)  He further opined that:

> Due to depressive symptoms the claimant is capable of interacting with supervisors and the general public occasionally and primarily superficially.  The claimant socializes minimally with others outside of his immediate family and has a history of anxiety which is likely to be exacerbated with constant interaction with the general public and supervisors.

(Tr. 90.)

## C.      Administrative Hearing

At the July 8, 2024 hearing, Mr. Brown's attorney requested that the ALJ send Mr. Brown for a consultative physical examination because there were no physical opinions from any treating source in the record.  (Tr. 44-45, 68-69.)  The ALJ indicated he would consider the

10

request for a consultative examination.  (Tr. 45, 68.)  Mr. Brown then testified in response to questions from his attorney and the ALJ.  (Tr. 46-63.)

A Vocational Expert ("VE") also testified at the hearing.  (Tr. 63-68.)  The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 23, 64-65), could not perform Mr. Brown's past work as a construction worker or auto mechanic but could perform representative positions in the national economy, including marker, routing clerk, and hand packager, all light, SVP 2 positions (Tr. 64-65).  The VE also testified that no jobs would be available for the described individual if any of the following limitations were added to the hypothetical: two additional 15-minute breaks per day in addition to regular breaks and lunch period to be taken at the individual's discretion; occasional reaching bilaterally in all directions; occasional handling and fingering bilaterally; being off task more than 10%; being absent more than one day per month; and using a cane for standing or walking.  (Tr. 66-68.)

**D.**     **Function Report**

On June 30, 2023, Mr. Brown completed a Function Report.  (Tr. 256-63.)  He reported constant pain in his lower back with an inability to stand or sit comfortably for more than 5-10 minutes at a time without changing positions.  (Tr. 256.)  His work as an auto mechanic caused him severe pain due to the positions he had to be in and the amount of weight he had to lift in order to perform the job.  (*Id*.)  Throughout the day, he had to stretch his back and neck.  (Tr. 257.)  His sleep was impaired and most of the time he slept on the floor because he could not get comfortable in a bed.  (*Id*.)  He took care of most chores and took out, fed, and walked the family dogs because his wife was working three jobs, but his wife also helped him take care of the dogs. (*Id*.)  As far as his ability to care for himself, he reported difficulty putting on pants, socks, and

11

shoes.  (*Id*.)  He had installed a shower bar for stability.  (*Id*.)  His hands and arms went numb when he washed his hair or shaved.  (*Id*.)

Mr. Brown reported using reminders to take care of his personal needs and grooming, and to take his medications.  (Tr. 258.)  He could prepare frozen dinners, sandwiches, and single course meals with rest breaks from standing.  (*Id*.)  He usually performed house and yardwork in 10-15 minutes intervals.  (*Id*.)  It took him an hour and a half with a break to mow the lawn using a riding lawn mower.  (*Id*.)  He could go out alone on short, local trips and could drive less than 10 minutes.  (Tr. 259.)  He shopped once a month for less than an hour.  (*Id*.)  His hobbies included working on cars, welding scrap art, playing with his dogs, and going to car shows.  (Tr. 260.)  He no longer rode his motorcycle because he felt unstable on it.  (*Id*.)  He participated in his hobbies less frequently than he had in the past due to his medical conditions.  (*Id*.)

As far as social activities, Mr. Brown went out to eat or visited a friend once a week.[1] (*Id*.)  He reported problems getting along with family, friends, and neighbors because he was unable to sit and stand and would get agitated, anxious, depressed, and irritated.  (*Id*.)  His anxiety, depression, aggravation, and irritation worsened with pain.  (*Id*.)  His impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, follow instructions, use his hands, and get along with others.  (Tr. 261.)

Mr. Brown was not prescribed a cane, but said he used one while walking.  (Tr. 262.)  He had left leg and foot pain after 10 minutes of walking.  (*Id*.)  He could walk for 5-10 minutes before needing to stop and rest for a few minutes.  (*Id*.)  His pain prevented him from finishing tasks or caused him to forget what he was doing while working on a project.  (*Id*.)  He could pay attention for less than 5 minutes.  (*Id*.)  He followed written instructions "poorly" and would lose

---

[1] At the July 8, 2024 hearing, Mr. Brown testified that he got out of the house two to three times per week to visit family or friends, to go the store, or to go out to eat.  (Tr. 54.)

12

track easily and get frustrated.  (*Id*.)  He followed verbal instructions "fairly well" if they were repeated because he usually did not understand instructions the first time.  (*Id*.)  He was fired from a prior job due to having conflicts with others at work when his opinions or thoughts did not agree with the opinions or thoughts of others.  (*Id*.)

Mr. Brown said he did not handle stress or changes in routine well.  (Tr. 262.)  When he was stressed, he would get nervous, shake, and sweat and become hot, irritated, and scared.  (*Id*.) When faced with changes in routine, he would get scared, anxious, nervous, and sweat.  (*Id*.)  He reported being scared of losing his wife because he could not provide for her and losing everything he worked for and owned.  (*Id*.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

13

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform other work available in the national economy.  *Id.*

### IV.     Law & Analysis

**A.      Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

14

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

15

**B.** **First Assignment of Error:  Plaintiff Has Not Shown That the ALJ Relied on an Insufficient Record or Had a Duty to Order a Consultative Examination**

In his first assignment of error, Mr. Brown asserts that the ALJ erred when he denied his "hearing attorney's request for the ALJ to obtain a physical consultative evaluation, and, instead, relied upon an insufficient record."  (ECF Doc. 7, pp. 10-18; ECF Doc. 11, pp. 1-7.)  More particularly, he argues: "given that the record in the instant case does not contain an opinion from a treating or examining source and given that the ALJ did not fully credit the PAMFs, the record is not sufficient, and the ALJ's failure to [grant his hearing attorney's] request [for] a consultative examination was improper."  (ECF Doc. 7, p. 16.)  In response, the Commissioner argues that the ALJ properly assessed Mr. Brown's RFC and did not err when he exercised his discretion not to order a consultative examination.  (ECF Doc. 10, pp. 5-9.)

Under Social Security regulations, ALJs have broad discretion to determine whether and when to order a consultative examination.  The regulations explain that the Commissioner "*may* decide to purchase a consultative examination," 20 C.F.R. § 404.1519a(a) (emphasis added), and outline the following potential situations where such an examination may be purchased:

> (b) Situations that may require a consultative examination. We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim. Some examples of when we might purchase a consultative examination to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis, include but are not limited to:
>
> (1) The additional evidence needed is not contained in the records of your medical sources;
>
> (2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;
>
> (3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or

16

> (4) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

20 C.F.R. § 404.1519a(b) (emphasis added); *see also* 20 C.F.R. § 404.1512(b)(2) (providing that the Commissioner "may order a consultative examination" when "a source is not productive, is uncooperative, or is unable to provide certain tests or procedures").

The Sixth Circuit has also confirmed that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."); *see also Cox v. Comm'r of Soc. Sec.*, 615 F.App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not "require the ALJ to order a consultative examination at all") (citations omitted).

Although he acknowledges that "the determination whether to order a consultative examination or obtain an opinion is discretionary," Mr. Brown nevertheless argues that the ALJ in this case "should have granted [his] hearing attorney's request for a consultative examination in light of the insufficiency of the record." (ECF Doc. 7, pp. 11, 16.)  He explains that the record was insufficient because it "does not contain an opinion from a treating or examining source and . . . the ALJ did not fully credit the [prior administrative medical findings]" of state agency medical consultants Dr. Gupta and Dr. Hughes.  (ECF Doc. 7, p. 16.)

Notably, neither the absence of a treating or examining medical opinion nor an ALJ's failure to "fully credit" a nonexamining medical opinion are listed among the situations where the SSA anticipates the evidentiary record may be "insufficient" to allow a decision on a claim without a consultative examination.  *See* 20 C.F.R. § 404.1519a(b).  Instead, the regulations

17

contemplate that a consultative examination may be required when "needed" medical evidence—

"such as clinical findings, laboratory tests, a diagnosis, or prognosis"—is not found in the

medical records, is not available due to "death or noncooperation of a medical source," is not

available from medical sources because it is "[h]ighly technical or specialized," or where there is

no evidence of the "current severity" of an impairment following a change in condition. *See id.*

Rather than explain how the evidentiary record is "insufficient" under the governing

regulations, Mr. Brown relies instead on a line of district court cases that follow a standard set

forth in *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), which held:

> where the transcript contains only diagnostic evidence and no opinion from a
> medical source about functional limitations (or only an outdated nonexamining
> agency opinion), to fulfill the responsibility to develop a complete record, the ALJ
> must recontact the treating source, order a consultative examination, or have a
> medical expert testify at the hearing.

*Id.* at 912; (*see* ECF Doc. 7, pp. 11-17 (citing on cases that rely on *Deskin*)). Because the ALJ

here found the state agency opinions "only partially persuasive" and "made different findings

based on his own lay interpretation of the objective findings, including cervical spine imaging,

reduced strength, BMI, and tenderness," Mr. Brown argues the ALJ was obligated to "further

develop the record" by granting his "request for a consultative examination." (*Id.* at p. 11.)

Importantly, *Deskin* is not binding authority and judges in this district have both

criticized and declined to follow that line of decisions. *See, e.g., Carr v. Comm'r of Soc. Sec.*,

No. 5:23-CV-00187, 2024 WL 1343473, at *5 (N.D. Ohio Mar. 30, 2024) (collecting cases). In

*Winans v. Comm'r of Soc. Sec.*, for example, the court found an "ALJ did not need to request a

consultative examination to make the disability decision," despite the lack of medical opinion

evidence, because the record contained "substantial evidence supporting the ALJ's finding that

[the plaintiff] was not disabled." No. 5:22-cv-01793, 2023 WL 7622634, *4 (N.D. Ohio Nov.

15, 2023). The court described *Deskin* as "a non-binding district court decision that conflicts

18

with the regulations and Sixth Circuit case law" and ultimately "places a higher burden on the ALJ than the Sixth Circuit does." *Id.*  Similarly, in *Fox v. Comm'r of Soc. Sec.*, the court acknowledged the body of cases applying the "*Deskin* rule," but observed that "*Deskin* isn't controlling, and it has received mixed reviews" before concluding:

> The bottom line is that various courts apply various standards from largely unpublished district court opinions. I return to the language of the regulations and Sixth Circuit authority, which make clear that the burden to prove her case rests on the claimant, not the ALJ.

No. 5:23-CV-580, 2023 WL 7018362, at *8-9 (N.D. Ohio Oct. 10, 2023) (citing *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) and 20 C.F.R. § 404.1512(a)), *report and recommendation adopted*, 2023 WL 7222824 (N.D. Ohio Nov. 2, 2023).  The undersigned agrees with the above criticisms of the "*Deskin* rule," and concludes instead that the Court's decision in this case should be governed by the regulations and Sixth Circuit authority.

The Sixth Circuit has explained that "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  In keeping with that responsibility, the Sixth Circuit does not require an ALJ to "get the opinion of another physician before setting the [RFC]." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018).  Indeed, the court has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Id.* at 401-02 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) *and Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)).  Considering this precedent, the undersigned concludes that Mr. Brown has failed to show that the evidentiary record was "insufficient" as contemplated in § 404.1519a(b) simply because the record did not

19

contain a treating or examining medical opinion regarding his physical impairments, or because the ALJ did not adopt verbatim the medical opinions of the state agency medical consultants.

Turning to the ALJ's specific factual findings and legal conclusions in this case, the undersigned further concludes that Mr. Brown has failed to show more generally that the evidence was "insufficient" to support the ALJ's adoption of a physical RFC without first obtaining a consultative examination.  First, the ALJ clearly explained his reasons for declining Mr. Brown's request for a consultative physical examination, explaining:

> The claimant has by and through his attorney during the hearing requested a post hearing physical consultative examination. The undersigned finds while such an examination might produce some information which could be material to the claim, the claimant nor his attorney has by any means demonstrated that a consultative examination is necessary to a complete evaluation of the claim of disability in this case. *See Landsaw v. Secretary* 803 F.2d 211 (6th Cir. 1986); *Vaughn v. Bowen,* S. D. Ohio No. C-2-88-0916 (J. Graham). Nor has the claimant or his attorney otherwise advanced any compelling reason why an examination should be ordered. The undersigned finds the evidence is sufficient to evaluate the nature and severity of the claimant's impairments and support a decision without a consultative examination. See 20 CFR 404.1519a(b). Accordingly, the undersigned has denied the request for post hearing consultative examination and has decided the claim on the existing, sufficient evidentiary record.

(Tr. 17.)  Thus, consistent with both the governing regulations and Sixth Circuit precedent, the ALJ exercised his discretion to deny Mr. Brown's request for a consultative examination only after he concluded that the evidence in the record was "sufficient to evaluate the nature and severity of [Mr. Brown]'s impairments and support a decision without a consultative examination."  (*Id.* (citing 20 C.F.R. § 404.1519a(b)).)

Second, in support of both the above conclusion and the physical RFC he adopted at Step Four of the sequential analysis, the ALJ summarized and discussed the treatment records relevant to Mr. Brown's obesity and spinal impairments (Tr. 25-26) before concluding:

> While the claimant continued to report significant neck and back pain, the objective evidence supported provider explained no more than mild condition severity requiring no more than conservative intervention without recommendation for any

invasive procedures or surgery. The claimant showed no more than some intermittent reduction in strength at the hips at 4/5 with 5/5 being normal. There were no observed gait deficits and while he reported using a cane, the claimant was not observed by treatment providers to use the device during treatment sessions. The claimant was cited as having no significant weakness with atrophy and there were no deficits in reflexes. The claimant did not report falls and was not assessed as a fall risk. The claimant showed no instability in the neck or back. He was not requiring any recurrent emergent treatment for back pain or neck pain described as being intractable.

(Tr. 26).  The ALJ then went on to explain that he:

appropriately considered the claimant's combination of physical conditions when reasonably reducing him to the performance of a limited range of light work noting he could occasionally climb ramps and stairs; could occasionally balance as that term is defined within the SCO; could occasionally kneel, stoop, crouch, and crawl; should avoid climbing ladders, ropes, and scaffolds; could frequently reach in all directions with the bilateral upper extremities and could frequently handle and finger with the bilateral upper extremities; should avoid exposure to unprotected heights and moving mechanical parts; and should avoid commercial driving.

(Tr. 26-27.)  The ALJ also considered Mr. Brown's treatment with medications and evidence that "his treatment regimen provided at least some medical benefit" (Tr. 28), reported activities that were inconsistent with the severity of his subjective complaints (Tr. 29), and other "documented inconsistencies and inconsistent statements" he found evident in the records (*id.*).  Mr. Brown has not identified any "necessary" medical evidence—whether it be clinical findings, laboratory tests, a diagnosis, or a prognosis—that was missing from the ALJ's summary or the record itself to support a finding that there was "insufficient" medical evidence for the ALJ to assess disability without a consultative examination, as contemplated in 20 C.F.R. § 404.1519a(b).

Finally, in addition to the medical treatment records discussed above, the ALJ considered the medical opinions of the state agency medical consultants (Tr. 70-81, 84-92), explaining:

The undersigned has read and considered the prior administrative physical findings evidenced within Exhibits 1A and 4A. The physical findings note the claimant could perform a reduced range of light work with postural; manipulative/reaching; and environmental limitations. The undersigned has not adopted the prior findings verbatim. The consultants supported their findings with citation to specific

21

evidence of record. The undersigned further finds the reduction to light exertional level work remained consistent with the claimant's objective imaging/diagnostic testing showing cervical and lumbar spine degeneration as well as body mass indexes between 30-39.9 indicative of obesity. The undersigned has not adopted the postural limits verbatim. The undersigned notes that postural limitations are supported but finds the objective evidence showing some intermittent reduced strength at 4/5 with 5/5 as normal with tenderness to the paraspinal muscles and sacral muscles supported greater limits on climbing ramps/stairs, balance, and kneeling. The greater limits are also supported by the claimant's ongoing obesity. The undersigned has not adopted the manipulative/reaching limits verbatim. The undersigned finds the cervical spine imaging supporting spinal degeneration and presence of cervical spine tenderness and the claimant's reports of ongoing neck pain into the upper extremities, affecting his ability to reach in combination with his obesity support for greater limitation on reaching in all directions. The undersigned notes the claimant's reports of numbness and tingling in the upper extremities due to the presence of spinal degeneration, evidence of muscle spasm present by the reduction in cervical lordosis, and his reports of pain, as well as the presence of obesity supported greater bilateral manipulative limits. The undersigned finds the limitation on hazards are supported by the presence of lumbar spine degeneration upon imaging and consistent with the claimant's ongoing obesity. Therefore, the undersigned finds the prior findings collectively partially persuasive, but notes the additional evidence of record supports greater physical limits and a more overall restrictive functional capacity.

(Tr. 30.)  Thus, the ALJ explained his divergence from the medical opinions as follows:

- Reduce *frequent* balancing, kneeling, and climbing ramps and stairs to *occasional* in light of physical examination findings of "intermittent reduced strength at 4/5" and "tenderness to the paraspinal muscles and sacral muscles";

- Replace *occasional overhead* reaching with *frequent* reaching *in all directions* in light of "cervical spine imaging supporting spinal degeneration," cervical spine tenderness, complaints of neck pain into the upper extremities, and obesity;

- Expand *frequent* handling and fingering on the left to include the bilateral upper extremities in light of spinal degeneration, cervical lordosis, pain, and obesity; and

- Modify *concentrated exposure* to hazards to altogether *avoiding* exposure to both hazards and commercial driving in light of "lumbar spine degeneration upon imaging" and obesity.

(*Id.*)  The ALJ therefore clearly explained both his reasons for finding the opinions partially persuasive and his reasons for adopting an RFC that diverged from those opinions.

22

Mr. Brown argues that the record was insufficient to support the RFC without a consultative examination because "the ALJ found the [state agency medical opinions] not fully persuasive, . . . did not rely upon an opinion, and . . . ultimately made findings based upon his own interpretation of the record."  (ECF Doc. 7, p. 13.)  Plaintiff further contends that the ALJ did not explain: "why reduced strength did not limit Plaintiff's ability to walk, squat, sit, or lift"; "how the findings of strength of 4/5 and decreased sensation to light touch in the left thumb and index finger permit the ability to reach, handle, and finger bilaterally frequently, which is defined as up to two-thirds of the workday"; and "how the objective findings still result in the ability to perform reaching, handling, and fingering up to two-thirds of the day, and the ALJ failed to explain how his lay interpretation results in such findings."  (ECF Doc. 7, pp. 13-14.)

On the contrary, the undersigned concludes that the analysis outlined above shows that the ALJ considered both the medical records and the state agency medical opinions, found those opinions partially persuasive, and adequately explained—with reference to specific findings in the record—why the ALJ concluded that the medical records supported different (and largely more restrictive) RFC limitations.  This was consistent with the ALJ's assigned role to both evaluate the medical evidence and determine the claimant's RFC.  *See Poe,* 342 F. App'x at 157 ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.") (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).  Mr. Brown has failed to show that the ALJ's findings lacked the support of substantial evidence.  Certainly, the lack of a medical opinion directly supporting each RFC limitation was not required, since an ALJ is "not required to obtain a medical expert to interpret the medical evidence related to his physical impairments."  *Rudd*, 531 F. App'x at 726.

It also warrants mention that the result would be the same in this case even if the Court applied the *Deskin* standard.  First, *Deskin* called for additional medical opinion evidence only where there was "no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion)."  *Deskin*, 605 F. Supp. 2d at 912.  Here, the state agency medical consultants, considered the medical records and offered their medical opinions regarding Mr. Brown's physical limitations.  (Tr. 77-79, 88-89.)  Second, in *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), the *Deskin* court narrowed the standard to cases where there is a "critical body of objective medical evidence" not accounted for by a medical opinion.  *Kizys*, 2011 WL 5024866, at *2.  Here, Mr. Brown neither argues nor demonstrates that there is a "critical body of objective medical evidence" that the state agency consultants failed to consider before rendering their opinions.[2]

For the reasons set forth above, the undersigned concludes that Mr. Brown has failed to show that the ALJ was obligated to obtain a consultative examination or that he adopted a physical RFC that lacked the support of substantial evidence.  Accordingly, the undersigned concludes that the first assignment of error lacks merit.

**C.      Second Assignment of Error: The ALJ Did Not Err in Evaluating the Subjective Allegations or Fail to Provide a Rationale for Excluding Certain Social Limitations**

In his second assignment of error, Mr. Brown argues the ALJ's RFC findings lack the support of substantial evidence because the ALJ erred in his evaluation of Plaintiff's subjective allegations and by excluding the "superficial" interaction limitation contained in state agency psychological consultant Dr. Dietz's opinion without adequate rationale.  (ECF Doc. 7, pp. 18-25; ECF Doc. 11, pp. 7-10.)  In response, the Commissioner argues that the ALJ properly

---

[2] Because Plaintiff failed to make the argument in his brief, it is now waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")  (internal citations omitted) (alterations in original).

24

evaluated Mr. Brown's subjective allegations and did not err in declining to adopt an RFC limitation excluding "superficial" interactions.  (ECF Doc. 10, pp. 9-14.)

      1.       **The ALJ Did Not Err in Evaluating Plaintiff's Subjective Allegations**

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  Under the two-step process to assess the limiting effects of a claimant's symptoms, the first determination is whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.

In undertaking the second step analysis, an ALJ should consider the objective medical evidence, the claimant's subjective complaints, information about the claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. § 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).  An

ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case. SSR 16-3p, 82 Fed. Reg. 49462, 49467.

Here, the ALJ considered Mr. Brown's "statements concerning the intensity, persistence and limiting effects of . . . [his alleged] symptoms," but found his allegations were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision."  (Tr. 25.)  The ALJ explained in detail his reasons for finding Mr. Brown's subjective allegations not entirely consistent with the medical evidence, stating:

> The claimant testified to the presence of incapacitating discomfort and associated functional limitations in contrast to the limitations assessed above. Social Security Regulation 20 CFR 404.1529 and SSR 16-3p in pertinent part, that when a claimant alleges symptomatology such as pain more than what would be expected by the medical evidence, further evaluation must be made. The claimant's prior work record, observations of treating physicians and other persons regarding the nature of the claimant's symptoms, the precipitating and aggravating factors, the use of medication and other treatment for relief of the symptoms, the functional restrictions, and the claimant's daily activities must be considered. Subjective complaints may be discounted if they are unsupported by the medical evidence of record.
>
> The claimant does have underlying medically determinable impairments that could reasonably cause some symptomatology. However, the pivotal question is not whether such symptoms exist, but whether those symptoms occur with such frequency, duration, or severity as to reduce the claimant's residual functional capacity as set forth above or to preclude all work activity on a continuing and regular basis. In this case, a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by the claimant. The objective evidence fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude the functional abilities described above. Rather, the factors set forth in 20 CFR 404.1529(c) support the residual functional capacity as assessed.
>
> With respect to the nature of the claimant's symptoms, precipitating and aggravating factors, the medications taken and any side effects, and other measures used to relieve the symptoms, the claimant did not testify to any significant/adverse medicinal side effects to prescribed medications or treatment modalities. The claimant did not report any significant/adverse medicinal/treatment side effects on forms he submitted to Social Security (Exhibit 4E). The claimant continued to be

26

prescribed medications by his routine providers and reported he was taking medications. The claimant was not routinely reporting any significant/adverse medicinal side effects to medical/treatment providers during his treatment sessions. This suggests his treatment regimen provided at least some medical benefit.

In addition to the general lack of objective evidence, the evidence of record does not support the severity of his subjective complaints. The claimant's reported condition and symptom severity are inconsistent with routine activities of daily living. The claimant was capable of cohabitating with his family without significant deficit. He could independently care for his personal needs including his hygiene and grooming with reminders. He could perform routine household chores with breaks for his physical conditions. The claimant could drive and navigate within his community without reported significant issue. The claimant could go to the store and out to eat with his wife. He could manage his medical care and appointments/medications with reminders. He was able to shop, manage his finances, and prepare simple meals. He continued to engage in activities he enjoyed such as watching television, listening to music, and spending time on his phone (Exhibit 5F).

The record contains additional documented inconsistencies and inconsistent statements. The claimant testified he had a short fuse. While he reported some irritability due to pain, the record was devoid of observed anger or hostility. The record supports the claimant himself admitted his mood was stable with medication and declined further behavioral health referrals and treatment. The claimant reported he had neck pain 80 percent of the time and cited his right arm was affected by his neck pain. While the record supported neck degeneration, it should be noted the claimant was *not assessed* as being a candidate for any surgical intervention (Exhibit 6F). The claimant was assessed with only mild residual symptomology and admitted only some flaring right upper extremity symptoms after engaging in significant physical activity, such as running a tiller (Exhibit 7F/6). The claimant self-reported that after the activity, his symptoms improved (Exhibit 7F/6). Prior to utilization of the tiller, upon neck examination by a specialist, the claimant showed normal 5/5 strength with normal sensation (Exhibit 6F/7). The claimant reported migraines about once a month lasting for hours. While he reported migraines, he admitted he was not taking medications for the headaches. The record supported no recurrent reports of headaches to medical providers and there was no routine or consistent treatment for headaches. Further, there was no emergent treatment for headaches described as being intractable or status migrainosus. While reporting irritability the claimant self-reported he could leave his home at least 2-3 times per week and go to public venues, including the store and out to dinner with his wife. The claimant reported he had to change positions every approximately 10 minutes to find comfort due to pain, but when observed during his treatment sessions, providers cited he was in "no acute/apparent" distress. While reporting significant levels of back and neck pain, he reported taking no more than ibuprofen for his pain and declined referrals for further intervention with pain management. Despite reporting significant back symptoms, he was noted to have normal muscle tone and

27

bulk, intact strength, sensation, and normal reflexes, with normal gait (Exhibit 6F/7, 8). The claimant was noted not to be a surgical candidate when his file was reviewed by a specialist in October 2023 (Exhibit 6F). The claimant reported sleep issues requiring him to nap during the day. While reporting needing to nap during his day, the record was devoid of any routine or consistent reports of naps due to fatigue or pain made to treating medical providers. Further, when he was observed during his medical appointments he was described as both alert and oriented as noted above. The claimant reported he needed to use a cane, but the record does not support the device was prescribed by any medical provider. The record showed only some intermittent reduction in strength at 4/5 with 5/5 as normal. More recently, he was noted to ambulate with a normal gait (Exhibit 6F/8). The claimant showed no spinal or neck instability. He was not treated, nor did he report recurrent falls or fall-related injuries.

(Tr. 28-29 (italics in original).)

Mr. Brown contends the ALJ erred in evaluating his subjective allegations, arguing "[t]he ALJ did not identify any inconsistency in the record, and the ALJ's findings are factually unsupported." (ECF Doc. 7, p. 22.)  The undersigned disagrees.  As set forth above, the ALJ clearly identified inconsistencies in the record to support his finding that Mr. Brown's subjective complaints were not entirely consistent with the evidence.  (*See* Tr. 29.)  Further, Mr. Brown has failed to show that the ALJ's findings lacked the support of substantial evidence.  Mr. Brown focuses on consistencies between his subjective complaints and other evidence, apparently arguing that the evidence overall should have been weighed differently.  For instance, he argues that his allegations of irritability are consistent with his treatment for anxiety and high pain levels, and with medical opinion evidence showing he had limitations resulting from anxiety and pain.  (*Id*. at pp. 21-22.)  But the question before this Court is not whether there is evidence in the record to support Mr. Brown's preferred findings.  Even if a preponderance of the evidence supports a finding that Mr. Brown's subjective complaints are credible, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

28

Here, consistent with SSR 16-3p, the ALJ considered relevant factors, including Mr. Brown's daily activities, the types and effectiveness of medications, and treatment received to address symptoms.  (Tr. 28-29.)  And consistent with SSR 16-3p, the ALJ provided "specific reasons for the weight given to the [Mr. Brown's] symptoms," and made findings that were "consistent with and supported by the evidence."  SSR 16-3p, 82 Fed. Reg. 49462, 49467.  Plaintiff has not met his burden to show these findings lack the support of substantial evidence.

Mr. Brown also argues that the ALJ's analysis of the opinions of Dr. Dietz and Dr. Dubey is internally inconsistent with the ALJ's rejection of Mr. Brown's symptoms.  (ECF Doc. 7, pp. 22-23.)  When the ALJ evaluated Dr. Dietz's opinion, Mr. Brown observes that he found limitations in the area of concentration/persistence/pace were "consistent with the claimant's physical reports of pain, fatigue related to sleep affected by coexisting physical and mental symptomology, low motivation associated with depression, and breakthrough nervousness/anxiousness related to reports of anxiety," and that "social limitation [wa]s supported given the claimant's reports that he is often irritable due to physical pain and breakthrough symptoms of worry."  (ECF Doc. 7, p. 22 (citing Tr. 30-31).)  The undersigned finds there is nothing internally inconsistent between the ALJ finding both that Mr. Brown's subjective allegations were not entirely consistent with the evidence and that the evidence still supported some degree of limitation in the areas of concentration/persistence/pace and social interaction.  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  It was the ALJ's role to weigh the evidence and resolve conflicts in the evidence, including the extent to which the record

29

supported functional limitations.  *See Garner*, 745 F.2d at 387.  Mr. Brown has not shown that the ALJ failed in this regard, or that the ALJ's findings lack the support of substantial evidence.

For the reasons set forth above, the undersigned concludes that the ALJ appropriately addressed Mr. Brown's subjective complaints, including those relating to anxiety and pain, in accordance with the requirements of SSR 16-3p, that the ALJ's findings were supported by substantial evidence, and that Mr. Brown has not met his burden to demonstrate otherwise.

**2.      The ALJ Provided an Adequate Rationale for Not Adopting All Social Limitations Set Forth in Dr. Dietz's Medical Opinion**

Mr. Brown also argues that the ALJ erred by failing to adopt Dr. Dietz's "limitations of superficial interaction without adequate reasoning."  (ECF Doc. 7, pp. 23-24.)  In response, the Commissioner argues the ALJ provided sufficient explanation as to why he did not adopt Dr. Dietz's superficial interaction limitation.[3]  (ECF Doc. 10, pp. 13-14.)

**i.       Framework for Assessing Medical Opinion Evidence**

"The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician," *Poe*, 342 F. App'x at 157 (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).  Accordingly, an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."  *Id*.  Even where an opinion was given great weight under prior regulations, the Sixth Circuit held "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x

---

[3] The Commissioner also argues that Mr. Brown's argument challenging the ALJ's evaluation of Dr. Dietz's medical opinion "has no place within an argument about the evaluation of subjective symptoms" because the "evaluation of medical opinion evidence is governed by different statutes and regulations."  (ECF Doc. 10, p. 13.)  The undersigned agrees that Plaintiff's argument regarding the evaluation of Dr. Dietz's opinion should have been identified and argued as a separate assignment of error.  The undersigned will address the argument in this instance, but Plaintiff's counsel is advised that each assignment of error should be separately captioned in future filings.

267, 275 (6th Cir. 2015).  But where an ALJ's RFC assessment "conflicts with an opinion from a medical source," he "must explain why the opinion was not adopted."  SSR 96–8p, 61 Fed. Reg. at 34478; *see Fleischer*, 774 F. Supp. 2d at 881.

An ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 404.1520c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024).  But the ALJ must evaluate the "persuasiveness" of any medical opinions using "factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c.  Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important are supportability[4] and consistency.[5]  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2), 404.1520c(c)(1)-(5).  The ALJ must explain how he considered consistency and supportability, but need not explain how he considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

---

[4] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion.  *See* 20 C.F.R. § 404.1520c(c)(1).

[5] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.  *See* 20 C.F.R. § 404.1520c(c)(2).

31

### ii.      The ALJ Properly Evaluated the Medical Opinion Evidence and Adopted Social Limitations Supported by Substantial Evidence

Here, as to Mr. Brown's ability to interact socially, the ALJ found he "could tolerate occasional interaction with coworkers, supervisors, and the general public." (Tr. 23.)  In reaching this conclusion the ALJ considered Mr. Brown's subjective complaints and reported activities, which included cohabiting with his wife and daughter, going to "public venues, such as the store," going out to eat with his wife, talking and text messaging with others, interacting appropriately with medical providers, and responding appropriately to questioning during his disability hearing.  (Tr. 22-23.)  The ALJ also considered his primary care treatment records, which included normal mental status examinations and noted the improvement of his mental health symptoms with a "conservative medication regimen" (Tr. 27), and observed:

> While the claimant reported recurrent anxiety, depression, the record supported no more than ongoing conservative medication management from his general practitioner. The record supported no significant breakthrough symptomology requiring any emergent treatment or hospitalization for diagnosed mental instability. The claimant recurrently denied hallucinations, delusions, and suicidal/homicidal ideations. The claimant also recurrently declined any mental health specific intervention with licensed behavioral health specialists, opting to continue with his conservative medication management.

(Tr. 28.)  The ALJ also noted "additional documented inconsistencies," such as:

- Mr. Brown testified that he "had a short fuse" and had "some irritability due to pain," but "the record was devoid of observed anger or hostility" and "the claimant himself admitted his mood was stable with medication and declined further behavioral health referrals and treatment" (Tr. 29); and

- "While reporting irritability the claimant self-reported he could leave his home at least 2-3 times per week and go to public venues, including the store and out to dinner with his wife" (*id.*).

In the context of these findings, the ALJ considered the medical opinions of state agency psychological consultants Drs. Seleshi and Dietz, who reached different conclusions regarding Mr. Brown's ability to interact socially (Tr. 30-31).  Dr. Seleshi concluded that Mr. Brown had

32

no more than mild limitations in his ability to interact with others, and did not include social limitations in his medical opinion.[6]  (Tr. 75-76, 79-80.)  In contrast, Dr. Dietz concluded that Mr. Brown had moderate limitations in his ability to interact with others, and found he was "capable of interacting with supervisors and the general public occasionally and primarily superficially" and that his "history of anxiety" was "likely to be exacerbated with constant interaction with the general public and supervisors."  (Tr. 86-87, 89-91.)  Considering those contrasting opinions regarding Mr. Brown's social limitations, the ALJ made the following findings:

> The undersigned has read and considered the prior mental findings evidenced within Exhibits 1A and 4A. The prior mental findings noted the claimant could perform routine tasks without expectation for sustained close concentration or fast paced performance; in a static environment with predictable expectations and infrequent changes explained in advanced. Upon reconsideration, it was further assessed the claimant could interact occasionally and superficially with others. The undersigned has not adopted the initial or reconsideration findings verbatim. Each findings is supported by citation to specific evidence of record. The undersigned, however, notes the reconsideration findings at 4A providing greater functional limits are more persuasive than the initial findings at 1A. The undersigned finds the lack of limitation in understanding, remembering, and applying information inconsistent with the evidence supporting reports of low energy/fatigue/breakthrough mental symptoms such as nervousness/anxiety and inconsistent with the claimant's physical reports of pain, collectively affecting his sleep. The undersigned finds the evidence supports greater limitation in the area to more simple instructions. The undersigned has not adopted the limitation in concentration/persistence/pace verbatim but finds limitation in the area consistent with the claimant's physical reports of pain, fatigue related to sleep affected by coexisting physical and mental symptomology, low motivation associated with depression, and breakthrough nervousness/anxiousness related to reports of anxiety. The undersigned finds the reconsideration findings providing limitation in social functioning, while not adopted verbatim, more persuasive than the initial limitations providing no social limit. The undersigned finds social limitation is supported given the claimant's reports that he is often irritable due to physical pain and breakthrough symptoms of worry. The undersigned has not adopted the

---

[6] The ALJ also considered the medical opinion of psychological consultative examiner Dr. Dubey (Tr. 31), who found Mr. Brown had no limitations in social functioning but opined that his difficulties with work pressures "may lead to some frustration for him, coworkers and supervisors" (382-84).  The ALJ noted that Dr. Dubey had "assessed no significant limitation in social functioning," but found "the evidence support[ed] greater limitation in this area" in light of Mr. Brown's reports of irritability due to pain, his mental diagnoses, observations that he was "nervous/anxious during treatment sessions," and his "use of two mental health medications to help control his emotions/symptomology."  (Tr. 31.)  Mr. Brown has not challenged the ALJ's findings regarding this opinion, but it is noted herein as another example of the ALJ's analysis of Mr. Brown's mental functioning and mental RFC.

adaptive limitation verbatim but finds the limitation in the area consistent with the claimant's need for at least conservative mental health medication for anxiety/depression to control his mental symptomology. Greater limitation is not warranted as the claimant himself declined behavioral health specialist intervention and there was no observed evidence of emergent treatment for symptom exacerbation or reports of active suicide/homicidal ideation. <u>Therefore, the undesigned has not adopted the initial or reconsideration findings verbatim, but collectively notes they are partially persuasive, finding the reconsideration findings at 4A more persuasive than those initial findings at 1A</u>.

(Tr. 30-31 (emphasis added).)

Mr. Brown argues that the ALJ failed to provide "adequate reasoning" or "rationale for excluding [Dr. Dietz's] superficial interaction limitation" from the RFC, noting that a "limitation to occasional interaction does not encompass a limitation to superficial interaction." (ECF Doc. 7, p. 23.) This argument apparently references SSR 96–8p, which provides in cases where an RFC assessment "conflicts with an opinion from a medical source" that the ALJ "must explain why the opinion was not adopted." 61 Fed. Reg. at 34478. But considering the discussion summarized above, the undersigned concludes that the ALJ adequately explained why he chose not to adopt "verbatim" the social limitations in Dr. Dietz's opinion. The ALJ explained that he rejected Dr. Seleshi's opinion that Mr. Brown had "no social limit" based on Mr. Brown's subjective complaints of irritability and breakthrough anxiety, and concluded that Dr. Dietz's "findings providing limitation in social functioning, while not adopted verbatim, [were] more persuasive." (Tr. 31.) But the ALJ had already discussed Mr. Brown's subjective allegations of irritability and anxiety in the context of the record as a whole, and found the reported severity of his complaints to be inconsistent with the complete record. (Tr. 22-23, 27-29.) Indeed, he specifically highlighted inconsistencies that included Mr. Brown's self-reported ability to "leave his home at least 2-3 times per week and go to public venues, including the store and out to dinner with his wife," clinical observations of his behavior, Mr. Brown's admission that "his mood was stable with medication," and his choice to "decline[] further behavioral health

34

referrals and treatment" (Tr. 29).  In this context, the undersigned concludes that the ALJ adequately explained his reasons for finding Dr. Dietz's opinion "partially persuasive" and adopting an RFC that limited Mr. Brown to "occasional" but not "superficial" interaction.

For the reasons set forth above, the undersigned finds that the ALJ's explanation of his rationale for not adopting all of the social limitations from Dr. Dietz's medical opinion was sufficient to allow for meaningful review by this Court, and that Mr. Brown has not met his burden to show that the ALJ's findings lacked the support of substantial evidence.  Accordingly, the undersigned finds the second assignment of error lacks merit.

## V.      Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.


August 4, 2026


/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).